UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| XIAOLIAN ZHENG,<br><br>    Plaintiff,<br><br>v.<br><br>ALEJANDRO N. MAYORKAS, et al.,<br><br>    Defendants. | Case No. 4:23-cv-02707-KAW<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 14 & 17 |

On May 31, 2023, Plaintiff Xiaolian Zheng filed this lawsuit against Defendants Alejandro N. Mayorkas, Ur M. Jaddou, and Danielle E. Lehman seeking to compel Defendants to adjudicate his asylum application, which was filed on July 2, 2020. (Compl., Dkt. No. 1 ¶¶ 1, 2; Compl., Ex. 1.) On August 30, 2023, Plaintiff filed a motion for summary judgment. On October 16, 2023, Defendants filed an opposition and cross-motion for summary judgment.

Upon review of the moving papers, the Court finds this matter suitable for resolution without oral argument pursuant to Civil Local Rule 7-1(b), and, for the reasons set forth below, DENIES Plaintiff's motion for summary judgment and GRANTS Defendants' cross-motion for summary judgment.

## I.  BACKGROUND

Plaintiff Xiaolian Zheng is a Chinese citizen, who filed a Form I-589 Application for Asylum and for Withholding Removal on July 2, 2020. (Compl. ¶¶ 1-2; Receipt Notice, Compl., Ex. 1.) Under the Immigration and Nationality Act ("INA"), a noncitizen "who is physically present in the United States or who arrives in the United States" is permitted to apply for asylum in the United States, subject to certain exceptions. 8 U.S.C. § 1158(a)(1). While an asylum application is pending, asylum applicants are eligible to apply for employment authorization, and

are deemed to be "lawfully present" for the purposes of applying certain benefits.  8 C.F.R. § 208.7(a)(1); *e.g.*, 8 C.F.R. § 1.3(a)(5) (deeming asylum applicants "lawfully present" for the purpose of applying for social security benefits).  Employment authorizations are renewable for a continuous period, in two-year increments.  8 C.F.R. § 208.7(a).

        Prior to 1995, regulations provided for the issuance of employment authorization to those who filed "non-frivolous" asylum applications.  (Decl. of John L. Lafferty, "Lafferty Decl.," Dkt. No. 17-1 ¶ 15.)  The regulations also permitted asylum applicants to obtain employment authorization if the agency failed to adjudicate their applications within 90 days.  (Lafferty Decl. ¶ 15.)  As nearly two-thirds of applications were not decided in 90 days, the former Immigration and Naturalization Service ("INS") began automatically mailing employment authorizations to asylum applicants upon receipt of their application.  (Lafferty Decl. ¶ 15.)  Such employment authorizations could be valid for years before an application was fully adjudicated.  (Lafferty Decl. ¶ 15.)  Consequently, asylum caseloads and corresponding processing times grew, as did the filing of non-meritorious or frivolous claims to secure employment authorization.  (Lafferty Decl. ¶ 15.)  By 1994, pending asylum applications numbered over 400,000.  (Lafferty Decl. ¶ 15.)

        In response, the INS instituted various reforms.  (Lafferty Decl. ¶ 16.)  One change was the implementation of the "Last-In-First-Out" ("LIFO") scheduling system, in which more recently filed cases were scheduled for interview before older cases.  (Lafferty Decl. ¶ 17.)  By giving priority to the newest cases, LIFO reduced the incentive to file non-meritorious asylum applications solely to obtain work authorization, as such cases would be heard more quickly.  (Lafferty Decl. ¶ 17.)  Such reforms helped reduce the backlog from over 464,100 applications in 1995 to 15,526 applications in 2013, of which just over 4,200 were pending for longer than six months.  (Lafferty Decl. ¶ 18.)

        Around 2013, however, an increase in credible and reasonable fear cases began to divert resources from asylum applications.  (Lafferty Decl. ¶¶ 19, 20.)  The Asylum Division is responsible not only for asylum applications, but for making credible and reasonable fear screening determinations.  (Lafferty Decl. ¶¶ 2(b), (c).)  Additionally, the Obama Administration requested that the Asylum Division begin prioritizing the processing of unaccompanied child

cases as the number of unaccompanied children applying for asylum increased from 410 in 2012 to 18,060 in 2017. (Lafferty Decl. ¶ 20.) Thus, most Asylum Officers were assigned to address the credible and reasonable fear cases, as well as unaccompanied child cases, resulting in very few asylum applications being adjudicated. (Lafferty Decl. ¶ 21.) This undermined the effectiveness of the LIFO scheduling system in discouraging non-meritorious filings, resulting in the United States Citizenship and Immigration Services ("USCIS") switching to a "First-In-First-Out" ("FIFO") scheduling system in December 2014. (Lafferty Decl. ¶ 21.)

After switching to FIFO, the number of asylum applications increased from 56,898 in 2014 to 141,695 in 2017. (Lafferty Decl. ¶ 32.) The backlog, in turn, increased by 77% in 2015, 79% in 2016, and 49% in 2017. (Lafferty Decl. ¶ 32.) This backlog also resulted in a substantial increase of non-meritorious asylum applications being filed to obtain work authorizations. (Lafferty Decl. ¶ 22.)

On January 31, 2018, USCIS announced it would return to LIFO. (Lafferty Decl. ¶ 24.) USCIS created a three-tier system for scheduling asylum interviews in descending order of priority: (1) applications already scheduled for an interview, but which had to be rescheduled; (2) applications pending no more than 21 days since filing; and (3) all other applications, starting with newer filings and working backwards towards older filings. (Lafferty Decl. ¶ 25.) Following the reimplementation of LIFO, asylum applications dropped to 106,147 in 2018, 95,959 in 2019, and 94,077 in 2020. (Lafferty Decl. ¶ 32.) Likewise, the backlog growth rate dropped to 10% in 2018, 7% in 2019, and 13% in 2020. (Lafferty Decl. ¶ 32.)

In addition to returning to LIFO, USCIS adopted other measures to address the backlog, including increasing the number of asylum officers, temporarily assigning former asylum officers to conduct credible and reasonable fear interviews, implementing new technology to streamline application adjudication, and opening a new centralized screening and vetting center. (Lafferty Decl. ¶¶ 38-42, 48.) In 2022, USCIS obtained $250 million for application processing, and hired 150 new Asylum Division staff. (Lafferty ¶ 49.) Using these new resources, USCIS is targeting completion of at least 1,000 of the longest pending affirmative asylum cases per month, and the agency met that target for FY 2022. *Id.*

1    Plaintiff submitted his asylum application on July 2, 2020. (Decl. of Danielle Lehman,
2  "Lehman Decl.," Dkt. No. 17-2 ¶ 14.) Plaintiff's application falls within the third category of the
3  LIFO scheduling system, *i.e.*, cases that have not been rescheduled or have not been pending for
4  fewer than 21 days. (Lehman Decl. ¶ 15.) Plaintiff has not made any request for advance parole
5  or sought permission to return to the United States after travel abroad. (Lehman Decl. ¶¶ 16.)
6  Plaintiff was granted an employment authorization on March 26, 2021, which was valid until
7  March 23, 2023. (Lehman Decl. ¶ 18.) On January 20, 2023, Plaintiff applied for an extension,
8  which is pending, but since he applied before it expired and he is not seeking to change his class
9  of eligibility, his validity period automatically extended for up to 540 days for its expiration date,
10 such that his employment authorization is valid until September 13, 2024. *Id.* Plaintiff is eligible
11 to renew his employment authorization in two-year increments during the pendency of his asylum
12 application. *Id.* Plaintiff made a request to be placed on the short notice list and was placed on the
13 list on April 1, 2021. (Lehman Decl. ¶ 19.)
14   On May 31, 2023, Plaintiff filed this case, bringing a single claim to compel the review of
15 his asylum application claims under the Mandamus Act and Administrative Procedure Act
16 ("APA"). (Compl. ¶¶ 6, 13, 14.)
17   On August 30, 2023, Plaintiff filed a motion for summary judgment. (Pl.'s Mot., Dkt. No.
18 14.) On October 16, 2023, Defendants filed their opposition and cross-motion for summary
19 judgment. (Defs.' Opp'n, Dkt. No. 17.) On November 6, 2023, Plaintiff filed a reply. (Pl.'s Reply,
20 Dkt. No. 20.) On November 27, 2023, Defendants filed a reply to their cross-motion for summary
21 judgment. (Defs.' Reply, Dkt. No. 23.)

## II.  LEGAL STANDARD

23  A party may move for summary judgment on a "claim or defense" or "part of... a claim or
24 defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when, after adequate
25 discovery, there is no genuine issue as to material facts and the moving party is entitled to
26 judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).
27 Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*,
28 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient

4

evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *see also Celotex*, 477 U.S. 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment. *Anderson,* 477 U.S. at 254. "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

### III.     DISCUSSION

Plaintiff's complaint consists of a single cause of action for adjudication of his asylum application. (Compl. ¶¶ 9-13.) Plaintiff claims that jurisdiction is conferred based on 28 U.S.C. §§ 1331 (federal question) and 1361 (Mandamus Act), and 5 U.S.C. § 701 (Administrative Procedures Act). (Compl. ¶ 6.)

#### A.     Subject Matter Jurisdiction

As an initial matter, Defendants contend that the Court lacks subject matter jurisdiction to hear Plaintiff's claims. (Defs.' Opp'n at 13.) 8 U.S.C. § 1158(d)(5)(A)(ii) requires that, "in the absence of exceptional circumstances, the initial hearing or hearing on the asylum application shall commence not later than 45 days after the date an application is filed." Plaintiff, however, does not rest his claim on this timing provision, because he acknowledges that there is no private right of action to enforce that timing. (*See* Pl.'s Reply at 3.) Instead, Plaintiff argues that Defendants are not permitted to let asylum applications languish, and that the Court has jurisdiction to consider whether, under the APA, there has been "unreasonable delay" in adjudicating his application. *Id.*

"Repeatedly, courts in the Ninth Circuit that have addressed § 1158(d)(7) have declined to conclude that a private right of action exists" to enforce the timing requirements of 8 U.S.C. § 1158(d)(5)(A). *Varol v. Radel*, 420 F. Supp. 3d 1089, 1095 (S.D. Cal. 2019); *Yan v. Dir. of L.A. Asylum Office*, No. 2:22-cv-05846-ODW (MRWx), 2023 U.S. Dist. LEXIS 105115, at *5-6 (C.D. Cal. June 16, 2023); *Teymouri v. United States Citizenship & Immigr. Servs.*, No. CV 22-7689 PA (JCx), 2023 U.S. Dist. LEXIS 17280, at *6 (C.D. Cal. Jan. 31, 2023). These same courts, however, have also found that this "prohibition against a private right of action to enforce the timing requirements set forth in Section 1158(d)(5)(A) does not deprive the Court of subject matter jurisdiction[.]" *Yan*, 2023 U.S. Dist. LEXIS 105115, at *6. This is because "the prohibition against a private right of action articulated in Section 1158(d)(7) does not preclude judicial review of USCIS's inaction under the APA," nor does it "include the jurisdiction-stripping language found elsewhere in the [Immigration and Nationality Act ('INA')]." *Id.* at *6-7; *see also Varol*, 420 F. Supp. 3d at 1096; *Fang v. Jaddou*, No. 2:21-cv-09488-RGK-E, 2022 U.S. Dist. LEXIS

6

103402, at *4 (C.D. Cal. Apr. 25, 2022). Thus, courts in this Circuit have repeatedly found that even if there is no private right of action to enforce the time frames set forth in 8 U.S.C. § 1158(d)(5)(A), the court may still review the agency's actions under the APA, which "specifies that an agency shall not unreasonably delay any discrete agency action." *Fang*, 2022 U.S. Dist. LEXIS 103402, at *4. Accordingly, the Court finds that to the extent Plaintiff alleges that Defendants have failed to act within a reasonable timeframe, the Court has jurisdiction to review this claim under the APA. (*See* Compl. ¶ 13.)

### B.    Mandamus Act (28 U.S.C. § 1361)

Next, Defendants argue that Plaintiff has no right to mandamus relief in this case. (Defs.' Opp'n at 14.) The Mandamus Act provides that "[t]he district courts shall have original jurisdiction of any action . . . to compel an officer or employee of the United States or an agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "Mandamus is an extraordinary remedy and is available to compel a federal official to perform a duty only if: (1) the individual's claim is clear and certain; (2) the official's duty is nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt, and (3) no other adequate remedy is available." *Kildare v. Saenz*, 325 F.3d 1078, 1084 (9th Cir. 2003) (internal quotation omitted).

Courts have found that 8 U.S.C. § 1158(d)(5)(A) cannot form the basis for mandamus relief because "the relevant statute makes clear that the 45-day rule is not a right enforceable by the applicant. The Ninth Circuit has held that identical language in other immigration statutes foreclose mandamus relief." *Alaei v. Holder*, No. 2:15-cv-08906-ODW (JPRx), 2016 U.S. Dist. LEXIS 69382, at *5 (C.D. Cal. May 26, 2016) (citing *Campos v. I.N.S.*, 62 F.3d 311, 313-14 (9th Cir. 1995)); *see also Yan*, 2023 U.S. Dist. LEXIS 105115, at *14 (same); *Teymouri*, 2023 U.S. Dist. LEXIS 17280, at *11-12 (same); *Ma v. Jaddou*, No. 2:22-cv-04210-MWF (KS), 2022 U.S. Dist. LEXIS 215766, at *6 (C.D. Cal. Sep. 26, 2022) ("Because Plaintiff has failed to state a claim for violation of the INA for which relief can be granted, Plaintiff has failed the first prong of the Mandamus Act that there is a clear and certain claim."). Plaintiff has cited no authority to the contrary, and the Court has found none. Accordingly, the Court finds that Plaintiff cannot state a claim under the Mandamus Act, and that Defendants are entitled to summary judgment to the

extent that Plaintiff seeks relief under this statute.

**C.   Administrative Procedure Act**

Finally, Defendants argue that Plaintiff cannot establish a viable claim under the APA. (Defs.' Opp'n at 15.)  Again, "[t]he APA requires an administrative agency to adjudicate matters presented to it within a 'reasonable time.'"  *Varol*, 420 F. Supp. 3d at 1096 (quoting 5 U.S.C. § 555(b)).  In determining whether agency delay is unreasonable, courts typically apply the factors set out in *Telecommunications Research and Action Center v. FCC* ("*TRAC* factors"), which are:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

750 F.2d 70, 80 (D.C. Cir. 1984) (cleaned up); *see also Indep. Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (applying TRAC factors in assessing whether relief under the APA was appropriate).  For the reasons set forth below, the Court finds that the *TRAC* factors favor Defendants, and that summary judgment must be granted in their favor.

**i.   Rule of Reason**

"The most important *TRAC* factor is the first factor, the 'rule of reason,' though it, like the others, is not itself determinative."  *Cmty. Voice v. United States EPA (In re Cmty. Voice)*, 878 F.3d 779, 786 (9th Cir. 2017).  This factor "requires that the time it takes for the agency to act is governed by a 'rule of reason.'"  *Ray v. Cuccinelli*, No. 20-cv-06279-JSC, 2020 U.S. Dist. LEXIS 205342, at *22 (N.D. Cal. Nov. 3, 2020).

While conceding that LIFO may qualify as a rule of reason, Plaintiff argues that it is not clear whether USCIS has followed LIFO, because Plaintiff's application was filed two years after the priority system was reinstated, and, three years later, he still has not been scheduled for an interview. (*See* Pl.'s Mot. at 6.)  In opposition, Defendants contend that the fact that Plaintiff has

8

not been scheduled for an interview does not call into question USCIS's LIFO approach given "the volume of asylum applicants and the success of the LIFO policy in reducing the backlog of pending asylum interviews and adjudications." (Defs.' Opp'n at 17-18.)

The Court finds that Defendants have explained why LIFO is a rule of reason, including the reasons for its implementation and effects on reducing the backlog while deterring frivolous or non-meritorious asylum filings. (*See* Lafferty Decl. ¶¶ 15, 17-18, 21-22, 24-25, 28, 32-34.) Specifically, Defendants explain that LIFO was implemented to deter frivolous and non-meritorious asylum applications filed primarily to seek work authorization. (Lafferty Decl. ¶ 17.) Defendants also point to the practical effects of implementing LIFO in 1995, which helped reduce the asylum application backlog from 464,100 cases in 1995 to 15,526 in 2012. (Lafferty Decl. ¶ 18.) Defendants also demonstrate how the adoption of FIFO in 2014 almost immediately resulted in a substantial increase of both asylum applications and the backlog, before the reimplementation of LIFO resulted in a decrease of asylum applications. (Lafferty Decl. ¶¶ 22, 25, 32.)

Indeed, courts in this Circuit have consistently found that LIFO is a rule of a reason. *See Varol*, 420 F. Supp. 3d at 1097 ("Defendants have convincingly asserted that LIFO is a sensible administrative response to the problem of increased frivolous, fraudulent, or meritless asylum filings that increase the overall caseload and extend wait periods for all applicants."); *Teymouri*, 2023 U.S. Dist. LEXIS 17280, at *8 (finding that LIFO is a rule of reason); *Yan*, 2023 U.S. Dist. LEXIS 105115, at *11 (same); *Singh v. Bardini*, No. 2:22-CV-01027-JAM-DB, 2023 U.S. Dist. LEXIS 125342, at *6 (E.D. Cal. July 19, 2023) (same).

Thus, the first factor favors Defendants.

### ii. Congressional Timetable

"The second *TRAC* factor considers whether Congress has provided an indication of the speed with which it expects an agency to act." *Jain v. Jaddou*, No. 21-cv-03115-VKD, 2023 U.S. Dist. LEXIS 57671, at *18 (N.D. Cal. Mar. 31, 2023). Courts have acknowledged that Congress has indeed "provided a clear timetable for the processing of asylum applications," including 8 U.S.C. § 1158(d)(5)(A)'s expectation that interviews be scheduled within 45 days. *Varol*, 420 F. Supp. 3d at 1097. That said, those same courts have found that such "timing requirements are not

9

mandatory" and "does not outweigh the rule of reason which supports the USCIS policies which have caused the challenged delays." *Id.* Rather, Congress has "indicated that USCIS retains limited discretion as to the timing of the adjudication of asylum applications under exceptional circumstances." *Yan*, 2023 U.S. Dist. LEXIS 105115, at *11.

Additionally, courts have considered the length of the delay in deciding this factor and found that even delays of over five years are reasonable. *See Teymouri*, 2023 U.S. Dist. LEXIS 17280, at *8-9 ("Moreover, while Plaintiff's application has been pending for over five years, courts have found similar delays to be reasonable."); *Yan*, 2023 U.S. Dist. LEXIS 105115, at *11 (finding a pending application of over four years to be reasonable); *Singh*, 2023 U.S. Dist. LEXIS 125342, at *7 (same); *see also Dosouqi v. Heinauaer*, No. C 12-3946 PJH, 2013 U.S. Dist. LEXIS 24757, at *5 (N.D. Cal. Feb. 22, 2013) (explaining that "courts have found delays of two, three, and four years to be reasonable" in processing of an I-485 adjustment application). While the Court does not seek to validate the delay that Plaintiff has endured since the filing of his asylum application in 2020, the length of this delay is not *per se* unreasonable under the *TRAC* factors.

Accordingly, the Court finds that this factor is neutral.

### iii. Human Health and Welfare, and Nature of Interests

The third and fifth *TRAC* factors, which overlap, concern "whether human health and welfare are at stake and the nature and extent of the interests prejudiced by delay." *Yan*, 2023 U.S. Dist. LEXIS 105115, at *12; *see also Indep. Mining Co.*, 105 F.3d at 509.

Here, Plaintiff does not articulate any specific hardship he is suffering by the delay other than the uncertainty of being able to remain in the United States. (*See* Pl.'s Mot. at 7.) Again, the Court does not seek to minimize Plaintiff's delay, but courts have repeatedly found in similar circumstances that these factors favor Defendants. For example, in *Yan*, the plaintiff similarly alleged that the delay in the adjudication of her asylum application caused "fear, despair, preoccupation and uncertainty," while also preventing her from being able to travel. 2023 U.S. Dist. LEXIS 105115, at *12. The district court, however, noted that the plaintiff could "legally live and work in the United States pending adjudication of her application, as well as travel abroad with the prior consent of the Attorney General." *Id.* Thus, "any prejudice [the plaintiff] faces

from delay is likewise faced by all asylum applications in similar positions." *Id.*; *see also Varol*, 420 F. Supp. 3d at 1097 (acknowledging "the difficulty in waiting for the asylum interview and the processing of Plaintiff's application," but finding that these factors favored the defendants as "Plaintiff continues to reside in the United States pending the processing of her application and is authorized to work"); *Alaei*, 2016 U.S. Dist. LEXIS 69382, at *8 (finding "no human health and welfare at stake in the delay as Plaintiff can legally live and work in the United States pending adjudication of her application"); *Teymouri*, 2023 U.S. Dist. LEXIS 17280, at *9-10 (finding allegations that the unexplained delay was "extremely stressful" and causing "significant emotional damage" was insufficient, and that such "allegations represent an extremely minimal showing of risk to human health or welfare and the prejudice Plaintiff faces from any delay is inherent in the process of seeking asylum."). As in these cases, Plaintiff has a work authorization and the ability to obtain other benefits and may remain in the United States pending adjudication of his application. Plaintiff may also travel abroad if the appropriate consents are obtained. Thus, the Court finds that the third and fifth *TRAC* factors favor Defendants.

### iv. Effect of Expediting Delayed Action

The fourth factor "consider[s] the agency's competing priorities." *Indep. Mining Co.*, 105 F.3d at 511. Here, the competing priority is the other asylum applications that have been filed, including those in a similar position as Plaintiff whose applications were filed before Plaintiff's. Thus, "granting relief to the Plaintiff simply moves [him] to the front of the line at the expense of all other applicants who may not have filed an application for mandamus relief." *Varol*, 420 F. Supp. 3d at 1098. While Plaintiff recognizes that line cutting is generally disfavored, he argues that this factor should be deemed neutral, because scheduling an individual application for a long-delayed interview would not "unduly upset agency priorities in general." (Pls.' Mot. at 8.)

The Court disagrees. Under such circumstances, "where a judicial order putting an individual at the head of the queue would simply move all others back one space and produce no net gain," courts have declined to grant relief. *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (internal quotation omitted); *see also Varol*, 420 F. Supp. 3d at 1098 (explaining that "it was sufficient to deny relief based on the fourth factor alone"

11

where "advancing [the plaintiff's] asylum application for interview and adjudication may negatively affect other applicants in a similar position"); *Yan*, 2023 U.S. Dist. LEXIS 105115, at *13 (same); *Teymouri*, 2023 U.S. Dist. LEXIS 17280, at *10-11 ("advancing Plaintiff's Application would not serve a higher or competing priority, but would instead merely delay the adjudication of all other applicants").

Thus, this factor favors Defendants.

### v.  Impropriety

The final factor considers whether there was any impropriety by the agency. *Indep. Mining Co.*, 105 F.3d at 510. Plaintiff cites no impropriety by Defendants, and the Court has found none. (*See* Pl.'s Mot. at 9.) Thus, this factor is neutral. *Yan*, 2023 U.S. Dist. LEXIS 105115, at *13.

### vi.  Conclusion

Taken together, the Court finds that most of the *TRAC* factors favor Defendants, and that they weigh against granting relief to Plaintiff under the APA. Accordingly, Defendants are entitled to summary judgment on Plaintiff's sole cause of action.

## IV.  CONCLUSION

For the reasons stated above, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendants' cross-motion for summary judgment. Judgment shall be entered in favor of Defendants, and the Clerk will be directed to close this case.

IT IS SO ORDERED.

Dated: January 11, 2024

KANDIS A. WESTMORE
United States Magistrate Judge